952 A.2d 452

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. SCOTT E. SCHNABEL A/K/A SCOT SCHNABEL, DEFENDANT–APPELLANT.

Argued March 11, 2008—Decided July 29, 2008.

118

*Michael B. Jones*, Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars*, Public Defender, attorney).

*Carol M. Henderson*, Assistant Attorney General, argued the cause for respondent (*Anne Milgram*, Attorney General of New Jersey, attorney).

Justice WALLACE, JR., delivered the opinion of the Court.

Defendant was convicted of first-degree aggravated sexual assault and related offenses allegedly committed against his girlfriend's two daughters. We must determine whether the admission of Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence was unduly prejudicial and whether evidence of third-party sexual abuse should have been excluded under the Rape Shield Law, *N.J.S.A.* 2C:14–7. We conclude that the CSAAS evidence was properly admitted. Moreover, in light of that evidence, we conclude that evidence of third-party sexual abuse should have been admitted.

## I.

In 1995, defendant met and began dating Mary Doe.[1] Mary was divorced with three children: John, born in 1982; Jane, born in

---

[1] Because of the sexual nature of the crimes, pseudonyms are used for the victims and their family. *N.J.S.A.* 2A:82–46.

1984; and Cindy, born in 1987. Defendant, who had two sons similar in age to Jane and Cindy, coached Jane's soccer team. At times, defendant cared for Mary's children after school, and in the evening when Mary attended school. In February 1996, defendant and Mary became engaged. Subsequently, defendant and his two sons moved into Mary's home and remained there until February 1998, at which time his relationship with Mary ended.

In 1999, when she was twelve years old, Cindy began using drugs. By August 2001, she had a serious heroin problem. As a result, she began drug counseling with a psychologist. During one of her counseling sessions, Cindy's psychologist asked her if she had ever been raped. Cindy revealed that defendant had sexually abused her. Cindy thought her disclosure would remain confidential, but the psychologist informed Mary and the Division of Youth and Family Services.

Sergeant Stephen Spiers of the Warren County Prosecutor's Office interviewed Cindy and Jane separately on a number of occasions regarding Cindy's abuse allegations. Both girls admitted to Sergeant Spiers that defendant sexually abused them. During one of his interviews with Jane, Sergeant Spiers inquired into whether anyone other than defendant had ever abused her. Jane hesitated to answer the question, but eventually admitted that she and her sister were abused by someone other than defendant before defendant began abusing them. Jane refused, however, to name the abuser and to give details about the abuse. Following that interview, Sergeant Spiers asked Cindy if anyone else had ever abused her. Cindy eventually replied that she had been abused before but never spoke to anyone except Jane about it. Cindy said that the initial abuse happened when she was in the first or second and third grades and she claimed that the abuse by defendant was similar to the abuse by the other person. Sergeant Spiers told Cindy that he had a pretty good idea who had abused her, and that it was not necessary for her to reveal his name. Cindy did not reveal the name.

Subsequently, John, Jane and Cindy's brother, testified before the Grand Jury that he sexually abused his sisters when he was in the fourth or fifth grade. Thereafter, defendant sought an order to permit questioning of Cindy and Jane regarding prior instances of sexual abuse by John. Defendant intended to utilize the evidence of prior abuse to show that Cindy and Jane fabricated the allegations against defendant. He advanced several theories of admissibility. First, defendant sought to admit the evidence under an exception to the Rape Shield Law pronounced in *State v. Budis*, 125 *N.J.* 519, 593 *A.*2d 784 (1991), that permits evidence of prior sexual abuse of young children to demonstrate knowledge of sexual acts. Defendant specifically sought to demonstrate that the sexual knowledge exhibited by the sisters in describing their allegations against him was actually based on their abuse by John. In addition, defendant argued that the girls' credibility was in issue because of inconsistencies between the statements given by the girls to Sergeant Spiers and their brother's Grand Jury testimony in respect of John's sexual abuse.

The State sought to exclude the evidence of John's abuse, arguing that the source of the girls' sexual knowledge was not in issue in the case because the girls were teenagers in high school at the time of disclosure and that it would not be unusual for them to have had the sexual knowledge necessary to make the allegations. Further, the State asserted that the evidence was irrelevant and would distract the jury from the main issue—whether defendant committed the crimes charged. The State added that because both girls and their brother admitted the prior abuse, credibility was not in issue.

The trial court found that evidence of the prior sexual abuse was not relevant and denied defendant's motion to admit that evidence. It found the age exception to the Rape Shield Law inapplicable because the girls were not of tender years, and that there was no credibility issue because "[t]here's no allegation that the brother is charged with abuse and that he's denied it and they said it happened."

At the time of trial, both Jane, then nineteen years of age, and Cindy, then seventeen, testified about defendant's abuse. Jane testified that defendant initially abused her soon after he began dating her mother. Jane stated that she was between eleven and thirteen years old at that time. She explained that the abuse began with defendant kissing and then rubbing her breasts and vagina, both over and beneath her clothing, but eventually progressed to digital penetration and oral sex. She further explained that it occurred as often as defendant had the opportunity to do so, and that defendant told her that it was their secret and that she could get in trouble if she told anyone about the abuse.

In a similar fashion, Cindy testified that defendant abused her from the time she was eight years old until the time he moved out of Mary's home. She described the abuse substantially the same as Jane had described it. Also similar to her sister, Cindy stated that she did not tell anyone about the abuse until she was counseled by her psychologist because defendant "told [her] not to tell anybody" and she "was scared ... that he would hurt [Jane] or [she] would get in trouble somehow." She added that she "didn't want to hurt" defendant's sons by sending their father to jail. Cindy admitted that she had been addicted to drugs for several years, but noted that she has remained drug free since June 2002.

After the girls testified, the State called Dr. Anthony D'Urso as an expert witness on child sexual abuse. Dr. D'Urso described CSAAS as "typical sequences of behavior that kids exhibit who are victims of child abuse and neglect." He emphasized that CSAAS was not a tool for diagnosing whether a child suffers from sexual abuse and that whether it applies to a given child depends on the particular facts of the case. He described the five sequences of CSAAS: (1) secrecy; (2) helplessness; (3) entrapment, coercion, or accommodation; (4) delayed or unconvincing disclosure; and (5) recantation. Dr. D'Urso noted, however, that a child may suffer from the syndrome without undergoing all of the sequences of behavior and that disclosure may be purposeful or accidental.

Following Dr. D'Urso's testimony, defendant renewed his motion to introduce evidence of John's prior sexual abuse. Defendant argued that he was prejudiced because the testimony of each of the girls was consistent with the first four sequences of CSAAS and because Dr. D'Urso was "a powerful witness." He further explained that the CSAAS testimony left the jury with the impression that the children fit the CSAAS profile and, without the evidence of John's abuse, the jury could only conclude that defendant was the cause of the children exhibiting CSAAS. Defendant noted that the girls not only delayed their disclosure of the purported abuse by defendant but also delayed disclosure of the abuse by their brother.

The State countered by arguing that the Rape Shield Law barred the evidence of the prior abuse; that the admission of that evidence would shift the jury's attention to a collateral person and cause confusion; and that the evidence was irrelevant because CSAAS is not a diagnostic tool for sexual abuse and the jury could not consider Dr. D'Urso's testimony for purposes of determining whether defendant abused the girls.

After argument, the trial court reversed its prior ruling and granted defendant's motion to admit the prior sexual abuse evidence. The court found the evidence relevant, recognizing that the abuse by John "may have offered an opportunity for the witness[es] to fabricate a story." For that reason, it found that defendant would be deprived of a fair trial if the court decided "not to permit the cross-examination of witnesses ... or offer testimony about the prior abuse."

The court also granted the State's request for a stay of the trial to file an emergent interlocutory appeal. On appeal, the Appellate Division denied the State's emergent application "to preclude defendant's evidence of the victims' prior sexual abuse." The State's emergent application to the Supreme Court was granted and this Court summarily reversed the trial court's ruling "without prejudice to defendant's right to raise the issue in an appeal

from any subsequent conviction," thus prohibiting evidence of John's conduct.

When the trial continued, defendant testified on his own behalf and denied that he touched either of the girls inappropriately. On cross-examination, the prosecutor asked defendant why Cindy would lie about the abuse three years after the end of defendant's relationship with the girls' mother. Defendant initially answered: "You have to ask [Cindy]." After further prodding by the prosecutor, however, defendant asked the court if he could answer the question. The trial court responded that he could. Defense counsel requested a sidebar, during which he noted that the prosecutor's question opened the door for defendant to violate the prohibition against referring to John's sexual abuse. The trial court then conducted an *N.J.R.E.* 104 hearing out of the presence of the jury to determine whether defendant could answer the prosecutor's question.

During the hearing, defendant offered three possible scenarios to explain Cindy's accusations: "she's making up a total lie, either I did it[,] or somebody else did it." With regard to Jane, defendant answered that the three possibilities applied to her as well and that she was probably "helping her sister out." Following a colloquy with the court, the prosecutor sought to withdraw the question. The trial court denied that request. It found that the prosecutor's question came at a "critical moment" in the trial and that allowing the prosecutor to withdraw the question "would leave a horrible impression in the jury's mind ... [about] what's going on here." It also pointed to defendant's proposed answer that somebody else sexually abused the girls and stated that in answering the prosecutor's question, "[defendant is] not going to mention the brother." The trial resumed and defendant answered the outstanding question by testifying that Cindy "didn't want to say who really did it."

The jury returned a verdict finding defendant guilty of each of the counts in the indictment: five counts of first-degree aggravated sexual assault, *N.J.S.A.* 2C:14–2a; five counts of second-degree

sexual assault, *N.J.S.A.* 2C:14–2b; two counts of second-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4a; two counts of third-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4a; and two counts of third-degree aggravated criminal sexual contact, *N.J.S.A.* 2C:14–3a. The trial court sentenced defendant to an aggregate term of thirty years' imprisonment.

The Appellate Division affirmed in an unpublished opinion. The panel found that the trial court properly precluded evidence of John's abuse. It reasoned that the prior abuse was not relevant because the girls' knowledge of sexual acts was not in issue, and that it was not relevant in determining whether defendant abused the girls. The panel also concluded that the evidence was not probative because there was "nothing in the record to suggest that the [girls] sought to protect their brother by blaming defendant," but rather would only distract the jury and create undue confusion. Further, the panel concluded that the trial court properly limited defendant's answer in response to the prosecutor's question as to why he believed Cindy would lie, noting that neither the question nor the answer prejudiced defendant. Likewise, the panel found no merit in defendant's argument raised for the first time on appeal that the CSAAS evidence by Dr. D'Urso unduly prejudiced defendant by impermissibly bolstering the credibility of the girls. Finally, the panel rejected a portion of defendant's claim of ineffective assistance of counsel, but reserved for post-conviction relief his contention that counsel was ineffective for failing to call character witnesses.

## II.

### A.

Defendant argues that the preclusion of the prior sexual abuse evidence deprived him of a fair trial because his constitutional rights to confront witnesses should prevail over the exclusionary purposes of the Rape Shield Law. He claims that the evidence is admissible under *Budis* to rebut that the girls gained sexual

knowledge through their experiences with defendant, noting that at the time of the alleged abuse, the girls were not significantly different in age from the victim in *Budis*. Additionally, defendant asserts that the State relied on the girls' emotional reactions and their demeanor on the witness stand to suggest to the jury that the girls must have endured sexual abuse by defendant. Because prior sexual abuse evidence was not admitted, however, defendant argues that he was deprived of the opportunity to attribute the girls' vivid description of the pattern of sexual abuse to their experiences with their brother and to argue that defendant was accordingly falsely accused. Defendant adds that because he could not raise the possibility that the girls changed who the abuser was in an otherwise substantially true story, he was forced to assert that the entire story was a fabrication. Defendant argues that such a defense, without the full context, could hardly be effective.

Additionally, defendant urges that because the admission of the CSAAS evidence further enhanced the credibility of the girls, it was unfair to deprive him of the opportunity to submit evidence that the girls' behavior that conformed to the syndrome may have had its genesis in their brother's abuse. He notes that to reduce the possible trauma to the girls, other witnesses could have presented evidence of John's prior sexual abuse. Defendant also contends that the CSAAS testimony was unduly prejudicial. He asserts that Dr. D'Urso essentially vouched for the credibility of the girls and supported the notion that they had been abused.

Lastly, defendant urges that he was denied effective assistance of counsel due to the manner in which his counsel cross-examined the State's witnesses and because of his failure to produce character witnesses on defendant's behalf.

## B.

In contrast, the State contends that the evidence of the prior sexual abuse was properly excluded under the Rape Shield Law. The State asserts that given the ages of the girls, the source of the

girls' sexual knowledge was not in issue in this case. The State further contends that the connection between the prior abuse and the abuse by defendant is insufficient to allow evidence of third-party guilt because that evidence would not demonstrate defendant's innocence, but would only serve to humiliate and further victimize the girls. The State adds that Dr. D'Urso's expert CSAAS testimony was a permissible response to defendant's attack on the girls' credibility based on their delayed disclosure and that the trial court properly instructed the jury on its limited use. Lastly, the State argues that the record reflects that defendant received effective assistance of counsel, but to the extent that such claims cannot be resolved on the current record, defendant should raise them in a post-conviction relief application.

### III.

#### A.

This case requires us to consider the right of a defendant to present a possible defense at trial in the face of the Rape Shield Law, which protects a victim from unwarranted intrusions into his or her past. Under the Rape Shield Law, "evidence of the victim's previous sexual conduct" is presumed inadmissible at trial. *N.J.S.A.* 2C:14–7a. We have explained that "[t]he overarching purpose of the Rape Shield [Law] is to protect the privacy interests of the victim while ensuring a fair determination of the issues bearing on the guilt or innocence of the defendant." *State v. Garron,* 177 *N.J.* 147, 165, 827 *A.*2d 243 (2003), *cert. denied,* 540 *U.S.* 1160, 124 *S.Ct.* 1169, 157 *L.Ed.*2d 1204 (2004). The Rape Shield Law is designed "to deter the unwarranted and unscrupulous foraging for character-assassination information about the victim" and "does not permit introduction of evidence of the victim's past sexual conduct to cast the victim as promiscuous or of low moral character." *Ibid.* Those concerns apply equally to a child-victim. *See Budis, supra,* 125 *N.J.* at 528, 593 *A.*2d 784.

■ We recently addressed the tension between the Rape Shield Law and a defendant's constitutional rights under the Federal and State Confrontation and Compulsory Process Clauses. *See Garron, supra,* 177 *N.J.* at 168–173, 827 *A.*2d 243; *see also Budis, supra,* 125 *N.J.* at 530–34, 593 *A.*2d 784. Both the Federal and New Jersey Constitutions guarantee a criminal defendant's right to confront the witnesses against him or her. *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10. Those constitutional rights "would be ... empty one[s] if the State were permitted to exclude competent, reliable evidence bearing on ... credibility ... when such evidence is central to the defendant's claim of innocence." *Crane v. Kentucky,* 476 *U.S.* 683, 690, 106 *S.Ct.* 2142, 2147, 90 *L.Ed.*2d 636, 645 (1986).

The United States Supreme Court recently reinforced the right to cross-examination, explaining that

the [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.

[*Crawford v. Washington,* 541 *U.S.* 36, 61, 124 *S.Ct.* 1354, 1370 158 *L.Ed.*2d 177, 199 (2004).]

In *Garron, supra,* we noted that a plain reading of the Rape Shield Law leads to the exclusion of prior sexual conduct unless it is highly material and its probative value substantially outweighs its prejudicial effect. 177 *N.J.* at 172, 827 *A.*2d 243. We observed that such a reading is at odds with "*N.J.R.E.* 403, which provides that relevant evidence 'may be excluded if its probative value is *substantially* outweighed by the risk of ... undue prejudice.'" *Ibid.* Thus, because "evidence of prior sexual conduct that is only material (not highly material) and that only has probative value outweighing (not substantially outweighing) its prejudicial impact would not be admissible at trial," we recognized that "[t]hat formulation of the [Rape] Shield [Law] would keep from the jury evidence that is admissible under the Confrontation and Compulsory Process Clauses." *Ibid.* Consequently, we held that "[w]e

must construe the [Rape Shield Law] so that its reach does not exceed its constitutional limits." *Ibid.*

To ensure that the Rape Shield Law preserves a defendant's right to a fair trial and to present the relevant evidence necessary for the defense, we "reaffirm[ed] the test advanced in *Budis* that evidence relevant to the defense that has probative value outweighing its prejudicial effect must be placed before the trier of fact." *Ibid.* That is, we must balance competing factors to determine when the admission of prior sexual abuse is appropriate. "The competing state interest served by barring proposed evidence must be 'clearly examined' when the denial or significant diminution of the rights of confrontation and compulsory process 'calls into question the ultimate integrity of the fact-finding process.'" *Id.* at 169–70, 827 *A.*2d 243 (citations omitted). In weighing the competing interests, "if evidence is relevant and necessary to a fair determination of the issues, the admission of the evidence is constitutionally compelled," and the Confrontation and Compulsory Process Clauses must prevail. *Id.* at 171, 827 *A.*2d 243; *see also Budis, supra,* 125 *N.J.* at 532, 593 *A.*2d 784 (proclaiming that evidence may not be constitutionally excluded if evidence is relevant and probative value outweighs prejudicial effect).

## B.

We turn now to apply those principles to the present case. That is, we must determine whether the evidence sought to be admitted was relevant to the defense, and if so, whether its probative value outweighed its prejudicial effect.

Evidence is relevant when it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401; *see State v. Jenewicz,* 193 *N.J.* 440, 457–58, 940 *A.*2d 269 (2008). In determining whether evidence is relevant, "the analysis focuses on 'the logical connection between the proffered evidence and a fact in issue.'" *State v. Williams,*

190 *N.J.* 114, 123, 919 *A.*2d 90 (2007) (quoting *Furst v. Einstein Moomjy, Inc.*, 182 *N.J.* 1, 15, 860 *A.*2d 435 (2004)). The "test [of relevancy] is broad and favors admissibility" unless otherwise excluded by a rule of law. *State v. Deatore,* 70 *N.J.* 100, 116, 358 *A.*2d 163 (1976).

In *Budis, supra,* we held that "prior sexual abuse of a youthful victim is relevant to rebut the inference that the complainant could not describe the details of sexual intercourse if the defendant had not committed the acts in question." 125 *N.J.* at 535, 593 *A.*2d 784. In other words, evidence of a child's prior sexual abuse and knowledge of sexual acts is relevant to "rebut[ ] the inference that [the child] acquired the knowledge to describe sexual matters from her experience with [the] defendant," and to demonstrate that the child "had the knowledge to initiate the sexual acts as described by [the] defendant." *Id.* at 534, 593 *A.*2d 784. The victim in *Budis* was nine years old when she told her father and a detective from the prosecutor's office that she was sexually abused. *See id.* at 524–25, 536, 593 *A.*2d 784.

We find no abuse of discretion in the trial court's initial determination that the evidence was not relevant as to the girls' sexual knowledge. As expressed by the Appellate Division panel, "[n]either [child] was of a tender age, nor can one say that their ages in today's world of movies, sexual education, television, the worldwide web, and magazines were such that either child would not possess knowledge of the acts they described when they first described them."

▮▮▮ Nevertheless, based on the complete record before us and the arguments advanced by defendant, we now find the evidence relevant. Because we are governed by an abuse-of-discretion standard, *State ex rel. J.A.,* 195 *N.J.* 324, 340, 949 *A.*2d 790 (2008), we should not have interfered with the trial court's ruling that the admission of prior abuse evidence was necessary for the jury to properly determine the credibility of each girl's testimony.

It was not disputed that when the allegations of sexual abuse first arose, Cindy only revealed that she was abused by defendant and made no reference to the abuse by her brother. It was not until after several interviews with Sergeant Spiers that first Jane and then Cindy revealed that they had been sexually abused by another person, and the statements of the sisters concerning the abuse by their brother differed in some respects from the testimony John gave to the Grand Jury. Thus, there were credibility issues among the stories advanced by the three children.

Just as important, the CSAAS testimony of Dr. D'Urso provided a "ring of truth" to the testimony of the sisters. Without knowing that the victims had previously been abused by their brother, the jury was asked to evaluate the CSAAS testimony of Dr. D'Urso on an incomplete record.

We note one additional factor that contributes to our conclusion that the brother's conduct should have been admitted into evidence. When the prosecutor on cross-examination asked defendant why Cindy would lie about the abuse, the prosecutor's request to withdraw the question was denied and the trial court permitted defendant to give a limited response, but not to refer to the brother. We have misgivings with respect to those rulings. First, the prosecutor should have been allowed to withdraw the question, thus avoiding the delicate issue. Second, once defendant was required to answer the question, he should have been permitted to answer truthfully, including a reference to the brother's conduct.

For the reasons expressed above, we conclude that the evidence of John's conduct was relevant and that its probative value outweighed its prejudicial effect and should have been presented to the jury. We reverse and remand for a new trial.

## C.

Because we anticipate the State will again present CSAAS evidence at retrial, we address defendant's challenge to that evidence. We detailed the use of CSAAS evidence in *State v.*

*J.Q.*, 130 *N.J.* 554, 560–74, 617 *A.*2d 1196 (1993). We observed that CSAAS involves five behavior patterns that may be exhibited by a sexually abused child: secrecy, helplessness, entrapment and accommodation, delayed reporting, and recantation. *See id.* at 568–70, 617 *A.*2d 1196. Recently, we recounted that CSAAS evidence is admissible only for the limited purpose to explain traits sometimes found in abused children that might otherwise undermine their credibility. *State v. R.B.*, 183 *N.J.* 308, 322–23, 873 *A.*2d 511 (2005) (citations omitted). "That is, it helps to dispel preconceived, but not necessarily valid, conceptions jurors may have concerning the likelihood of the child's truthfulness as a result of her delay in having disclosed the abuse or sought help." *Id.* at 323, 873 *A.*2d 511 (quoting *State v. P.H.*, 178 *N.J.* 378, 395, 840 *A.*2d 808 (2004)). Further, in *J.Q.* we "determined that CSAAS expert testimony may serve a 'useful forensic function' when used in a rehabilitative manner to explain why many sexually abused children delay in reporting their abuse, or later recant allegations of abuse." *P.H.*, *supra*, 178 *N.J.* at 395, 840 *A.*2d 808 (citing *J.Q.*, *supra*, 130 *N.J.* at 579, 617 *A.*2d 1196).

Additionally, the trial court must inform the jury of the limited purpose of CSAAS evidence. *Id.* at 396, 840 *A.*2d 808. In *P.H.*, we added to the substance of the jury charge on the use of CSAAS evidence and recommended that our trial courts "should instruct the jury based on *Model Jury Charge (Criminal)*, Child Sexual Abuse Accommodation Syndrome (2001)." *Id.* at 399, 840 *A.*2d 808.

Our review of the record satisfies us that there was no error in the expert's CSAAS testimony. The State offered the CSAAS testimony for the purpose of rebutting the inference that the girls were lying because they did not immediately disclose the abuse. Dr. D'Urso was qualified as an expert. He explained that CSAAS was not a diagnostic device, but rather comprised behavioral sequences typically exhibited by abused children. He outlined those sequences. Although it was possible for the jury to draw parallels between Dr. D'Urso's CSAAS testimony and each girl's

testimony, his testimony was general in nature and did not imply an opinion as to whether the girls were abused. In short, we find no error in the presentation of that evidence.

## V.

We affirm the judgment of the Appellate Division in part, reverse in part, and remand for a new trial consistent with this opinion.

· *For Affirmance in Part/Reversal in Part/Remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.