**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1402-18T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

SAMY J. MARTINEZ-JAQUEZ,
a/k/a SAMY JONEL, and
SAMY MARTINEZ-VASQUEZ,

    Defendant-Appellant.

_____

Submitted October 19, 2020 – Decided January 6, 2021

Before Judges Rothstadt, Mayer, and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 17-09-1212.

Joseph E. Krakora, Public Defender, attorney for appellant (Stephen W. Kirsch, Designated Counsel, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (Craig A. Becker, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Samy J. Martinez-Jaquez appeals from his judgment of conviction and sentence that were entered after a jury acquitted him of first-degree carjacking, N.J.S.A. 2C:15-2, but convicted him of the lesser included offense of third-degree theft, N.J.S.A. 2C:20-2(b)(2)(d), as to a vehicle he stole in New Jersey, and one count of third-degree receiving stolen property, N.J.S.A. 2C:20-7, as to a car that was stolen in New York and brought into New Jersey. On appeal, he raises the following contentions:

POINT I

THE MOTION TO SUPPRESS DEFENDANT'S STATEMENT TO POLICE SHOULD HAVE BEEN GRANTED BECAUSE POLICE NEVER INFORMED HIM THAT CHARGES HAD ALREADY BEEN FILED AGAINST HIM, AND, THUS, UNDER STATE V. A.G.D., HIS WAIVER OF HIS RIGHT AGAINST SELF-INCRIMINATION WAS NOT VALID.

POINT II

IN DIRECT VIOLATION OF CRANE V. KENTUCKY, THE TRIAL JUDGE IMPROPERLY BARRED DEFENSE COUNSEL AT TRIAL FROM CHALLENGING THE CREDIBILITY OF THE DEFENDANT'S STATEMENT TO POLICE WITH EVIDENCE OF THE CONDITIONS UNDER WHICH DEFENDANT WAS HELD AT THE 33RD PRECINCT.

2

POINT III

IN DIRECT CONTRAVENTION OF LONG-ESTABLISHED CASE LAW, THE TRIAL JUDGE IMPROPERLY ADMITTED DEFENDANT'S ONLY PRIOR CONVICTIONS INTO EVIDENCE TO IMPEACH HIS CREDIBILITY IF HE TESTIFIED DESPITE THE FACT THAT THOSE CONVICTIONS WERE ON APPEAL AT THE TIME.

POINT IV

THE JURY INSTRUCTION ON RECEIVING STOLEN PROPERTY ERRONEOUSLY GAVE THE JURY THE OPTION OF CONVICTING DEFENDANT EITHER BECAUSE HE RECEIVED THE PROPERTY IN NEW YORK OR BECAUSE HE BROUGHT IT INTO NEW JERSEY, WHEN, IN FACT, ONLY THE LATTER THEORY SHOULD HAVE BEEN INSTRUCTED; RECEIVING STOLEN PROPERTY IN NEW YORK IS NOT A CRIME IN NEW JERSEY. (NOT RAISED BELOW).

POINT V

THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE.

We have considered defendant's arguments in light of the record and applicable principles of law. For the reasons that follow, we vacate defendant's conviction and the denial of his motion to suppress his statement to police and remand for a new trial.

3

At approximately 10:00 p.m. on June 28, 2016, B.B., a Pennsylvania resident, was sitting in the front passenger seat of her van with the windows down at a rest stop on the New Jersey Turnpike, waiting for her son, who was driving her vehicle, to return from using the facilities. While B.B. waited, her focus was on her cell phone until, suddenly, a man "jumped into the car and immediately tried to just take off."

B.B. "struggled" with the man and tried to remove the key from the ignition as he tried to turn the key. As he twisted her hand, the engine started. According to B.B., the man did not "hit" her or force her out of the car, but he "twisted" her hand and wrist when he turned the key to start the engine. She did not have any scrapes or bruises on her hands. Before he drove off, B.B. jumped out of the passenger seat and the man drove off in her car.

In response to B.B.'s 911 call, police arrived, and she described the assailant as a man who wore a tank top, had a beard and was "muscular," "sweaty" and "not well groomed." She described the lighting in the car as "medium."

The following day police showed B.B. a photo array that included defendant's picture and asked if she could identify the man who stole her car.

She signed one photo as depicting a person who looked like the man, but she was unable to definitively identify him. The police later told her that she had chosen the wrong person.

Later during the night that the car was stolen, Officer Daniel Nah from the 33rd Precinct of the New York City Police Department (NYPD) received a dispatch with information from the New Jersey State Police regarding B.B.'s stolen vehicle. At 12:40 a.m. on June 29, 2016, Nah saw defendant wearing a white t-shirt or tank top standing in a parking lot at the back of a vehicle that matched the description of B.B.'s stolen car. The vehicle bore a New York license plate.

Nah turned into the parking lot and defendant got inside the car and began to drive toward the exit of the lot. Nah stopped defendant, arrested him, and found two Pennsylvania license plates inside the car. Defendant was transported to the 33rd Precinct where he was placed in a holding cell at approximately 1:00 a.m.

At approximately 12:00 p.m., Detective Michael Walters of the 34th Precinct transported defendant to the 34th Precinct because there was an open investigation in that precinct into defendant's theft of the car he had been driving prior to stealing B.B.'s van. There, defendant was questioned by Walters, with

5

Detective Michael Rodriguez serving as a Spanish translator for defendant. By the time of his transfer, charges had been filed against defendant in the 33rd Precinct regarding defendant's arrest earlier that morning.

During his interrogation, defendant eventually explained that he had stolen a different van two days earlier in New York, which he drove into New Jersey, and when that vehicle ran out of gas, he stole B.B.'s van, but he denied having any physical contact with her. The interrogation was recorded on video, and the video was later played for the jury.

A New Jersey grand jury later returned an indictment charging defendant with one count of first-degree carjacking, N.J.S.A. 2C:15-2, and one count of third-degree receiving stolen property, N.J.S.A. 2C:20-7. Prior to his trial, defendant filed a motion to suppress the statement he gave to New York police. After a three-day hearing, the trial court denied the motion, finding that defendant had voluntarily and knowingly waived his rights after becoming aware of the charges against him from the detective's questions.

During the ensuing trial, Nah appeared as a witness and testified to defendant's arrest and transfer to another precinct for questioning. During his cross-examination, the trial court precluded defendant from questioning Nah on the circumstances surrounding his pre-confession detention at the 33rd Precinct

because the court had already denied defendant's motion to suppress his statement. However, the court later permitted defendant to ask similar questions of Rodriguez about the actual interrogation at the 34th Precinct.

Thereafter, the jury returned its verdict. On September 7, 2018, the court sentenced defendant to five years' imprisonment for the theft conviction, subject to a two-and-one-half-year period of parole-ineligibility, and a consecutive three-year term for the receiving stolen property conviction. The court ordered that the sentences run consecutive to defendant's four-year New York sentence that he was already serving. This appeal followed.

## II.

We begin our review by addressing the issue raised by defendant in Point II of his brief about the trial court's interference with his cross-examination of the officer who arrested and held him in a cell for at least eight hours[1] before transferring him to another precinct for questioning. We conclude that the trial court's ruling was a "clear error of judgment" as it impermissibly interfered with defendant's Sixth Amendment rights. State v. Medina, 242 N.J. 397, 412 (2020)

---

[1] The record is unclear as to the exact length of time because Nah implied it was eight hours, while Walters indicated he picked up defendant at noon, eleven hours after defendant's arrest.

A-1402-18T2

("[W]e . . . employ the abuse of discretion standard . . . for all evidentiary rulings.").

## A.

The issue arose at trial after defense counsel asked Nah to describe the holding pen area that defendant was detained in after arrest. Nah answered that it was a large room with two cells, an arrest processing room, and a restroom. Counsel asked if there was a toilet within the holding cells, and the prosecutor raised a relevance objection.

At sidebar, the court asked defense counsel: "What are you going to— litigate a <u>Miranda</u> [sic]? What are we doing here?" Counsel argued that the circumstances surrounding the interrogation were relevant to the jury's assessment of whether defendant had voluntarily given the statement. The court responded that counsel raised "a legal issue" that it already ruled upon. The objection was sustained.

Defense counsel then asked Nah how long defendant was kept in the holding cell, the prosecutor objected, and the court sustained the objection. Defense counsel asked if defendant was provided any food or water and whether he was permitted to make a phone call. The court sustained the objections and instructed counsel to move on to the next line of questioning.

8

Counsel asked Nah about his police report and then returned to the circumstances surrounding defendant's pre-interrogation detention by asking: "[I]s there any type of blankets that are given to people who are in custody?" The prosecutor raised a relevance objection, which the court sustained. Counsel asked whether "[a]ny type of clothing . . . is provided to people in custody" and the prosecution again raised a relevance objection which the court sustained. Counsel then asked Nah whether anyone had given defendant any clothing, blankets, or food while in custody, at which point the court interjected: "Counsel, why do you keep asking questions that you know I've already sustained the objection [sic]?" Counsel persisted and asked Nah if he had provided defendant "anything." Nah answered that he usually gave prisoners food and water.

This led to a sidebar discussion where the court admonished defense counsel for ignoring her ruling. Counsel argued that the information was highly relevant to the credibility of defendant's police statement, and the court responded that it had made its ruling. Counsel asked a few more questions about Nah's report then ended his cross-examination.

The following day defendant filed a motion for a mistrial based on the court's refusal to allow him to question Nah on the circumstances leading to his

9

interrogation. Counsel began by saying that he had never been previously precluded from asking such questions, and the court responded: "Have you ever been told by a Court that you can't relitigate a Miranda [m]otion, because that's what you were trying to do yesterday, counsel."

Counsel disputed that the court's ruling on the suppression motion barred him from asking the questions he posed to Nah. Counsel cited to the United States Supreme Court's opinion in Crane v. Kentucky, 476 U.S. 683 (1986), that held that the circumstances surrounding an interrogation—including how long the defendant had been held and under what conditions he was held before being interrogated—were relevant to the jury's credibility assessment of the statement, separate from the court's evidential ruling on whether the statement is admissible as evidence. The trial court responded: "Well, that's an issue—I've already made my decision. That's an issue that you can raise on [a]ppeal, if the jury convicts the defendant." After some further debate, the court added that defense counsel's questions had gone beyond the scope of direct and were irrelevant.

Later, during Rodriguez's cross-examination, defense counsel was permitted to ask questions about the circumstances relating to the interrogation after defendant had been transferred to the 34th Precinct.

10                                                                        A-1402-18T2

B.

On appeal, defendant argues that the trial court's ruling was inconsistent with Crane and denied him the ability to present to the jury information necessary to their assessment of his statement to police. We agree.

The Sixth Amendment to the United States Constitution grants a criminal defendant the right to confront witnesses, to due process of law, and "to a meaningful opportunity to present a complete defense." Crane, 476 U.S. at 690 (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). So too does Article I Paragraph 10 of New Jersey's Constitution. See State v. R.Y., 242 N.J. 48, 66 (2020); State v. Rosales, 202 N.J. 549, 561 (2010). "Consistent with Crane, [New Jersey's Supreme Court has] declared that 'few rights are more fundamental than that of an accused to present [evidence] in his own defense.'" Rosales, 202 N.J. at 561 (quoting State v. Sanchez, 143 N.J. 273, 290 (1996) (citations, alterations, and internal quotation marks omitted)).

Under Crane, a defendant must be provided the opportunity to present "reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." Crane, 476 U.S. at 690. Such evidence includes the circumstances "surrounding the making of a confession,"

11

as that evidence "'bears on its credibility' as well as its voluntariness," both of which are factual questions that the jury must resolve. Id. at 688 (quoting Jackson v. Denno, 378 U.S. 368, 386 n.13 (1964)).

The right to confront and cross-examine witnesses is "not absolute," however, "and may, in appropriate circumstances, bow to competing interests." State v. J.A.C., 210 N.J. 281, 298 (2012) (quoting State v. Budis, 125 N.J. 519, 531 (1991)). Thus, a trial court may exclude evidence when its probative value is outweighed by its prejudicial effect, risk of harassment, confusion of the issues, concern for a witness's safety, and repetitive or marginally relevant character evidence. Ibid. (discussing Budis, 125 N.J. at 532).

Here, the trial court's ruling contravened Crane. Defendant was entitled to question Nah on the circumstances leading to his interrogation because that information was relevant to the jury's assessment of the statement's reliability, irrespective of the court's legal determination that the statement was admissible. Crane, 476 U.S. at 688. "[T]he manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess." Ibid.

Confessions are evidence of guilt that a jury must consider along with all of the other evidence adduced during a trial. As the Court explained in Crane:

> The manner in which a statement was extracted is, of course, relevant to the purely legal question of its voluntariness, a question most, but not all, States assign to the trial judge alone to resolve. See Denno, 378 U.S. at 378. But the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. Confessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be "insufficiently corroborated or otherwise . . . unworthy of belief." Lego v. Twomey, 404 U.S. [477, 485–86 (1972)].
>
> [Id. at 688–89.]

Crane distinguished trial court rulings on the admissibility of a confession from credibility findings by the jury. Ibid. "[B]ecause 'questions of credibility, whether of a witness or of a confession, are for the jury,' the requirement that the court make a pretrial voluntariness determination does not undercut the defendant's traditional prerogative to challenge the confession's reliability during the course of the trial." Id. at 688 (quoting Denno, 378 U.S. at 386 n.13). In the absence of the surrounding circumstances of the interrogation, the jury cannot answer the question that "every rational juror needs answered," namely: "If the defendant is innocent, why did he previously admit his guilt?" Id. at 689. That question must have been in the minds of the jurors in this case.

13

Here, the trial court barred the cross-examination solely because it had determined that defendant's statement was admissible, although it later added that the testimony was irrelevant and beyond the scope of direct. Those additional findings were equally erroneous. Under Crane, the circumstances surrounding an interrogation are relevant to the statement's reliability, and in this case, counsel's questioning was not beyond the scope of direct because it related to the details of Nah arresting defendant, an officer placing him in a holding cell after arrest, and the precinct keeping him there until Walters transported him to the 34th Precinct. Thus, the circumstances surrounding defendant's detention were relevant and not beyond the scope of direct. See State v. Schnabel, 196 N.J. 116, 130 (2008) (quoting N.J.R.E. 401 for the proposition that "[e]vidence is relevant when it has 'a tendency in reason to prove or disprove any fact of consequence to the determination of the action.'"). To the extent the court's decision was based on these grounds, it too was an abuse of discretion. See id. at 131 (explaining that the trial court's evidentiary rulings are reviewed under an abuse of discretion standard).

Moreover, the trial court's error in barring the cross-examination because it already determined the Miranda issues was not harmless. The State's case relied to a significant extent on defendant's confession, particularly with respect

14

to the receiving stolen property charge. As to that charge, defendant was found guilty of "knowingly . . . bring[ing] into this State movable property of another knowing that it has been stolen." N.J.S.A. 2C:20-7. That offense was only otherwise established through testimony from the owner of the stolen New York vehicle that at some point he lost possession of his vehicle and he did not give defendant permission to possess it. Without defendant's confession, the jury could have found the evidence insufficient to establish that defendant had driven the van knowing or believing that it was probably stolen.[2]

Moreover, in his statement to police, defendant initially denied that he had stolen the first van in New York, claiming that a man he knew let him borrow it to visit his daughter in New Jersey. It was not until the end of the interrogation after the police had pressed him that defendant changed his story and said that he took the van from a man.

If allowed to consider the barred testimony from Nah, the jury could have found that defendant's will had been overborn, particularly if the circumstances during his at least eight-hour confinement at the 33rd Precinct lent weight to that finding. Under these circumstances we cannot consider the error to be harmless.

---

[2] N.J.S.A. 2C:20-7(b) allows for a presumption of the knowledge or belief element of the crime in certain situations. None of those situations appear to be applicable to this case, and the court did not include them in the jury charge.

See State v. Garron, 177 N.J. 147, 171 (2003) (explaining that "if evidence is relevant and necessary to a fair determination of the issues, the admission of the evidence is constitutionally compelled.").  See also State v. Granskie, 433 N.J. Super. 44, 55–56 (App. Div. 2013) (affirming the trial court's decision allowing the defendant to present evidence of heroin withdrawal to explain the basis for his confession, emphasizing that the State's case rested heavily on the confession, thus increasing the importance of the evidence to the jury).  We are therefore constrained to vacate defendant's conviction and remand for a new trial.

                                                III.

    We turn our attention to defendant's contention in Point I of his brief that his waiver of his Fifth Amendment rights under Miranda was invalid because he was never advised of the charges against him as required under State v. A.G.D., 178 N.J. 56 (2003), as well as State v. Vincenty, 237 N.J. 122 (2019), an opinion issued after defendant's conviction.  Defendant argues that the trial court erred in interpreting A.G.D. because it believed that it did not matter whether the officers ever advised defendant of the charges as, based on the officer's questions and defendant's answers, defendant understood there were charges

16

against him so not advising him of the exact charges was not fatal to the validity of his waiver.

We conclude that the trial court misinterpreted A.G.D.  We therefore remand the issue to the trial court to make findings as to whether defendant was advised of the charges against him before giving his statement.  If the trial court finds defendant was not properly advised, it should also consider whether his statement was still admissible as argued by the State under the "silver platter doctrine."

A.

In A.G.D., the Court held that under state law, the police must advise a suspect "that a criminal complaint or arrest warrant has been filed or issued against him [where] he otherwise does not know that fact."  178 N.J. at 58.  In Vincenty, the Court explained that A.G.D. requires "law enforcement officials to make a simple declaratory statement at the outset of an interrogation that informs a defendant of the essence of the charges . . . .  That information should not be woven into accusatory questions posed during the interview."  237 N.J. at 134.  In State v. Sims, __ N.J. Super. __ (App. Div. 2020), a case we also decide today, we held that the requirement equally applies to a waiver from a defendant who was arrested based upon information developed through a police

investigation, but not yet charged in a complaint or an indictment at the time of his arrest. Id. at __ (slip op. at 2). Under these holdings, a suspect's waiver of Miranda rights will be "per se invalid" if police failed to notify the defendant of the charges against him or her, and the defendant did not otherwise know his or her "true status" as a charged or arrested suspect. State v. Nyhammer, 197 N.J. 383, 404 (2009) (discussing and quoting A.G.D., 178 N.J. at 68). See also Sims, __ N.J. Super. at __ (slip op. at 18).

At the suppression hearing, on cross-examination, Nah testified that before defendant was transported to the 34th Precinct, he had filed two complaints against him "for the car and the license plates." Those complaints were transferred with defendant to the 34th Precinct, but Nah did not give defendant a copy of them. Nah was aware a complaint had also been filed in the 34th Precinct. He stated that he was unaware if authorities charged defendant in New Jersey, and only indicated that at some point he called New Jersey authorities to let them know NYPD had detained their suspect.

When asked if he ever told defendant that "New Jersey's charging him with this car-jacking" of B.B.'s van, Nah answered: "I don't believe I did, I don't recall." He also did not recall telling defendant anything about New Jersey's interest in him.

A-1402-18T2

Walters testified that after Nah had telephoned him to say that he had defendant in custody, he took possession of defendant, transported him to the 34th Precinct, and placed him in a holding cell for about ten minutes before interrogating him. Walters was already aware that charges had been filed in the 33rd Precinct against defendant about being in possession of B.B.'s car and that there was already an "open complaint" against defendant in the 34th Precinct as to the New York van. Walters did not inform defendant about the complaints or the specific charges.

Rodriguez testified that he did not have any information regarding Walters' investigation of defendant or the open complaint against defendant when Walters asked him to translate. Rodriguez recalled that he did not tell defendant that he was "charged with car-jacking, robbery, [and] receiving stolen property."

At the beginning of the interrogation, Rodriguez advised defendant of his Miranda rights, and defendant said that he understood them. Defendant then stated, "Whatever you want to ask about, I will answer." Rodriguez did not notify defendant of the charges Nah had filed against him or of the charges in the open complaint. He began the interrogation by asking: "Do you know why

19                                                                    A-1402-18T2

you were arrested?" Defendant answered: "Yes, Sir . . . . Because I took a van."

The interrogation lasted no more than forty-five minutes. Near the end of the interview, Rodriguez asked defendant if he was hungry, and defendant said no, he had eaten a sandwich earlier.

The trial court denied defendant's motion to suppress, finding no evidence to suggest that defendant had involuntarily or unknowingly waived his <u>Miranda</u> rights. The officers had testified that defendant cooperated from the time that Nah had stopped him until he was interrogated. Nothing in the testimony suggested that defendant was denied food, water, or use of a bathroom. The video recording of the interrogation showed defendant with his arms in his shirt, as if the room had been cool, but he had not complained about the temperature. He also did not appear to be impaired or under the influence of coercion. After Rodriguez advised him of his <u>Miranda</u> rights, he said that he would answer any questions they had and that he understood he had been arrested because he had taken a van.

The trial court did not believe that <u>A.G.D.</u> required the officers to advise defendant of the charges because as stated in <u>A.G.D.</u>, "[t]here [was] no question" that defendant understood them and that a "veil of suspicion" had been draped

A-1402-18T2

over him, thus heightening his risk of criminal liability. Further, the court said that the A.G.D. Court had cautioned that its decision was not intended to alter the way in which police interrogate suspects.

We conclude that the trial court's understanding of A.G.D. was misguided. The Supreme Court in A.G.D. made clear that "[w]ithout advising the suspect of his true status when he does not otherwise know it, the State cannot sustain its burden to the Court's satisfaction that the suspect has exercised an informed waiver of rights, regardless of other factors that might support his confession's admission." A.G.D., 178 N.J. at 68. In Vincenty, the Court explained that to ensure a defendant makes a knowing and intelligent waiver of the right against self-incrimination, A.G.D. requires

> law enforcement officials to make a simple declaratory statement at the outset of an interrogation that informs a defendant of the essence of the charges filed against him. That information should not be woven into accusatory questions posed during the interview. The State may choose to notify defendants immediately before or after administering Miranda warnings, so long as defendants are aware of the charges pending against them before they are asked to waive the right to self-incrimination.
>
> [Vincenty, 237 N.J. at 134.]

"If suspects are not informed that a criminal complaint or arrest warrant has been filed against them, they necessarily lack 'critically important information' and

A-1402-18T2

thus 'the State cannot sustain its burden' of proving a suspect has knowingly and intelligently waived the right against self-incrimination." Id. at 133–34 (quoting A.G.D., 178 N.J. at 68).[3]

Thus, Vincenty clarified that before asking any questions, the officer must not only notify a defendant that a complaint or warrant has been filed or issued but must also inform the person of the "essence of the charges." Id. at 134.

Here, the only mention of the charges filed against defendant was the office's preliminary inquiry whether defendant knew "why [he] was arrested." That type of question under A.G.D. and Vincenty simply does not suffice for the purposes of satisfying the Court's express requirement that a suspect be advised of the true nature of any charges made against him. The only other reference was that neither Nah nor Walters could recall if either ever told defendant about the charges filed against him or gave him a copy of the complaints. The trial court did not make any findings about that issue because it believed the fact that defendant was not advised of the charges did not matter.

---

[3] We find the State's reliance on appeal upon our opinion in State v. Henderson, 397 N.J. Super. 398 (App. Div. 2009) to be inapposite, as that case was decided almost ten years before the Court issued its opinion in Vincenty, which clarified what A.G.D. requires. Further, Henderson provides no support for the State's argument that asking defendant here at his interrogation if he knew why he was arrested was a permissible basis for concluding he was aware of the charges against him as required by A.G.D. and Vincenty.

A-1402-18T2

Under these circumstances, we must remand for the trial court to make the required findings and apply A.G.D. correctly in order to determine whether defendant's waiver of his right to remain silent was valid under New Jersey law, and if not, whether it would still be admissible under the "silver platter" doctrine.

B.

The "silver platter" doctrine arose in the context of search and seizure law and has been extended to police statements obtained after waiver of the right against self-incrimination. State v. Knight, 145 N.J. 233, 259 (1996) (applying the silver platter doctrine to find inadmissible a defendant's statement obtained by the Federal Bureau of Investigation (FBI) where the FBI acted as an agent for New Jersey). The doctrine provides that when a foreign law enforcement agency obtains evidence under legal standards that are less protective than New Jersey's, the evidence will nonetheless be admissible in a New Jersey court so long as the evidence was obtained during an independent investigation, in accordance with the standards of the foreign jurisdiction, and no agency relationship existed between the two jurisdictions with respect to collection of the evidence for the crime at issue. State v. Mollica, 114 N.J. 329, 353–54 (1989). Accord Knight, 145 N.J. at 259.

"Differing relationships and interactions may suffice to establish agency." Mollica, 114 N.J. at 355. As the Mollica Court explained,

> antecedent mutual planning, joint operations, cooperative investigations, or mutual assistance between [the two jurisdictions] may sufficiently establish agency and serve to bring the conduct of the [foreign] agents under the color of state law. On the other hand, mere contact, awareness of ongoing investigations, or the exchange of information may not transmute the relationship into one of agency.
>
> [Ibid.]

The inquiry is one that "will always pose a fact-sensitive exploration that is influenced greatly by the surrounding circumstances." Id. at 356.

The State argues that even if the court erred in finding defendant's statement admissible under A.G.D., the statement was nonetheless admissible under the silver platter doctrine. Defendant argues that if the doctrine applies, his statement would still be inadmissible because the New York officers acted as agents of New Jersey when they interrogated him.

At the hearing, some evidence was offered on the agency issue, as defendant argued that the officers had acted as New Jersey agents and had only arrested defendant when they discovered him with B.B.'s van because of the carjacking he committed in New Jersey. Nah testified on cross-examination that "the only thing [he] knew" about New Jersey's investigation was "that there was

24

a car-jacking from New Jersey and they tracked the car to [the park address in New York]." At some point, he called "New Jersey authorities," but they did not discuss the charges that New Jersey would or did file.

Walters testified that at some point during the interrogation he left the room to take a call from New Jersey law enforcement. He did not recall who he spoke with or if he had known in advance that the person would call him. Walters did not recall speaking with New Jersey prior to this call and claimed that the investigation he conducted was on behalf of the NYPD. On cross-examination, Walters said that when he took the call from the New Jersey police, he advised them that he was currently questioning defendant, and they told him that a vehicle from New York—the one that defendant had stolen prior to taking B.B.'s vehicle—had been found in New Jersey.

Therefore, on remand, the trial court should also reconsider its earlier decision whether the New York officers complied with A.G.D. and its progeny. If they had not, the court should consider whether the statement is nonetheless admissible under the silver platter doctrine.

IV.

Because we have vacated defendant's conviction and ordered a new trial, we need not address defendant's remaining arguments about the prosecutor

25

impeaching defendant with his New York conviction that was previously under appeal,[4] the jury charge for receipt of stolen property, or his sentence. As these issues arise during his new trial, we leave it to the trial court to address them anew.

In sum, the denial of defendant's motion to suppress his statement and his conviction are vacated and the matter is remanded for reconsideration of the Miranda issue and for a new trial.

Vacated and remanded for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

4  Defendant was convicted in New York and received a four-year aggregate term in prison. That conviction was under appeal at the time of his trial in this matter.

A-1402-18T2